Approved: _____
　　　　　　AMY FINZI/JEFFREY A. BROWN/GLEN G. McGORTY
　　　　　　Assistant United States Attorneys

Before:　　HONORABLE DEBRA FREEMAN
　　　　　　United States Magistrate Judge
　　　　　　Southern District of New York

- - - - - - - - - - - - - - - - - - - x
　　　　　　　　　　　　　　　　　　　　　　:
UNITED STATES OF AMERICA　　　　　　　:　　　COMPLAINT
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　- v. -　　　　　　　　　　　:　　　Violation of
　　　　　　　　　　　　　　　　　　　　　　:　　　21 U.S.C. § 846
ANGEL MORALES,　　　　　　　　　　　　　:
　　　a/k/a "Jose Rodriguez,"　　　　　:　　　COUNTY OF OFFENSE:
　　　a/k/a "Tarenga,"　　　　　　　　　:　　　BRONX
ALEJANDRO SALVADOR OROZCO,　　　　　　:
ALVARO SALAZAR VELO, and　　　　　　　:
MARIO SOSA-GINESTI,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Defendants.　　　:
　　　　　　　　　　　　　　　　　　　　　　:
- - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK　　　　　　　　)
COUNTY OF NEW YORK　　　　　　　 ) ss.:
SOUTHERN DISTRICT OF NEW YORK  )

　　　　　JOHN BARRY, being duly sworn, deposes and says that he is a Detective with the New York City Police Department and is assigned to the New York Drug Enforcement Task Force (the "Task Force"), and charges as follows:

　　　　　1.　　In or about August 2007, in the Southern District of New York and elsewhere, ANGEL MORALES, a/k/a "Jose Rodriguez," a/k/a "Tarenga," ALEJANDRO SALVADOR OROZCO, ALVARO SALAZAR VELO, and MARIO SOSA-GINESTI, the defendants, and others known and unknown, unlawfully, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

　　　　　2.　　It was a part and an object of the conspiracy that ANGEL MORALES, a/k/a "Jose Rodriguez," a/k/a "Tarenga," ALEJANDRO SALVADOR OROZCO, ALVARO SALAZAR VELO, and MARIO SOSA-GINESTI, the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, to wit, 5 kilograms and more of mixtures and substances containing a detectable amount of cocaine, in

violation of Sections 812, 841(a)(1) and 841(b)(1)(A) of Title 21, United States Code.

(Title 21, United States Code, Section 846.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

3. I am a Detective with the NYPD where I have been employed for approximately 17 years. I have been assigned to the Task Force for approximately 4 years. While with the NYPD and the Task Force, I have participated in investigations of drug trafficking involving the importation, distribution and possession of narcotics, including cocaine. I am familiar with the facts and circumstances set forth below from my participation in the investigation of this case, from my personal knowledge and from my conversations with other law enforcement agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest ANGEL MORALES, a/k/a "Jose Rodriguez," a/k/a "Tarenga," ALEJANDRO SALVADOR OROZCO, ALVARO SALAZAR VELO, and MARIO SOSA-GINESTI, the defendants, I have not included every fact I have learned during the investigation. Where the actions, statements and conversations of others are recounted herein, they are related in substance and in part, unless otherwise indicated.

4. Beginning in 2005, the Task Force began investigating a network of individuals and organizations responsible for the importation and distribution of large quantities of cocaine in the New York City area and elsewhere. During the course of this investigation, I have received an extensive amount of information from a variety of confidential sources which have proved to be consistently reliable and corroborated. Based in part on information provided by these confidential sources of information, the Task Force has received authorization to intercept over 20 cellular telephones being used by various narcotics traffickers and money launderers. The information obtained from the confidential sources of information and the wiretaps has led to the seizure of over $18 million in narcotics proceeds, over 1,000 kilograms of cocaine, over 1,800 pounds of marijuana, and over 10 pounds of crystal methamphetamine, and the arrest of over fifty individuals.

5. Based in part on information provided from one of these confidential sources, I identified a co-conspirator not named as a defendant herein ("CC-1") as a major importer and distributer of cocaine in the New York City area, and intercepted several telephones utilized by CC-1 in connection with CC-1's narcotics trafficking activities. During the course of the investigation, several defendants who pled guilty or are

2

scheduled to plead guilty to cooperation agreements with the Government have provided detailed and corroborated information about CC-1's criminal conduct. From the sources of information, I also learned that an individual using the name "Tarenga," (later identified as ANGEL MORALES, the defendant) delivered large quantities of cocaine to CC-1's New York City-based customers, as well as collected narcotics proceeds from them.

6. Based on information provided by confidential sources of information, other members of the Task Force and I began conducting surveillance of ANGEL MORALES, a/k/a "Jose Rodriguez," a/k/a "Tarenga," the defendant, in January 2007.

7. On or about August 9, 2007, members of the Task Force and I were conducting surveillance in the vicinity of 243 5th Avenue, New York, New York. At approximately 6:50 p.m., we observed a male later identified as ANGEL MORALES, a/k/a "Jose Rodriguez," a/k/a "Tarenga," the defendant, carrying a large cardboard box into a UPS store at that location. At approximately 6:55 p.m., MORALES exited the UPS store without the cardboard box and walked west on West 27th Street. Immediately thereafter, we entered the UPS store and spoke with an employee, and then with a representative from UPS security. From UPS, I obtained the shipping information used by MORALES. In addition, the UPS Employee told us that that MORALES regularly ships via Priority Overnight shipping numerous boxes to the same location in California.[1] I know that the return address used by MORALES on these packages — which purported to be a personal residence in New York City — does not exist. Pursuant to UPS policy, UPS provided me with the cardboard box left by Morales, which we seized and recovered twenty ladies' handbags contained therein. Four of these handbags contained approximately $110,000 in United States currency.

8. Throughout August 2007, other members of the Task Force and I conducted surveillance on multiples occasions of ANGEL MORALES, a/k/a "Jose Rodriguez," a/k/a "Tarenga," the defendant, and what we believe to actually be his residence, 425 Quincy Avenue, Bronx, New York (the "Residence").

9. Based on information from confidential sources, I learned that ANGEL MORALES, a/k/a "Jose Rodriguez," a/k/a "Tarenga," the defendant, was expecting a load of cocaine to arrive in the New York City area.

---

[1] During the investigation, the Task Force has learned that a significant quantity of cocaine being distributed by the organizations in this case is coming from Mexico by way of California and Texas.

10. On or about August 29, 2007, at approximately 12 p.m., members of the Task Force and I were conducting surveillance of ANGEL MORALES, a/k/a "Jose Rodrigiez," a/k/a "Tarenga," the defendant, in the vicinity of the Residence. I then observed MORALES drive into New Jersey in a gray Chevy Jimmy SUV (the "SUV"). I began mobile surveillance of MORALES and observed him on Penhorn Avenue in Secaucus, New Jersey.[2] MORALES left Penhorn Avenue and we followed MORALES as he returned to the Bronx. Of note, MORALES drove in an extremely circuitous route back towards the vicinity of the Residence which is consistent, based on my training and experience, with counter-surveillance techniques often utilized by individuals attempting to evade or elude detection by law enforcement. Specifically, MORALES drove from New Jersey through the Lincoln Tunnel, up the West Side highway, to the Cross Bronx Expressway, to the Major Deegan Expressway, to 233rd Street, to the Bronx River Parkway South, to the Cross Bronx Expressway (again), to the Randall Avenue exit, at which time he left the highway, and proceeded back in the direction of the Residence.

11. At approximately the same time as ANGEL MORALES, a/k/a "Jose Rodriguez," a/k/a "Tarenga," the defendant, was driving on the West Side Highway, another member of the Task Force was conducting surveillance in the vicinity of the location on Penhorn Avenue where MORALES had just departed. At that location, Penhorn Avenue is a dead-end street with commercial business on both sides of the street. The Task Force member observed a tractor-trailer parked in a parking lot located at 901 Penhorn Avenue in Secaucus, New Jersey, in the vicinity of where MORALES had been surveilled. The rear door of the tractor trailer appeared to be open for unloading cargo, despite the fact that it was not parked near any of the commercial structures or loading docks in its vicinity. At that time, the Task Force member observed a gold Chevy Impala (the "Impala") with its trunk opened parked parallel to the tractor trailer. The Task Force member observed an individual later identified MARIO SOSA-GINESTI, the defendant, loading a box into the trunk of the Impala. The Task Force member observed what appeared to be other similar boxes already in the trunk of the Impala. Based on his training and experience and familiarity with the investigation, knowledge of how this particular area was utilized by narcotics

---

[2] Earlier in this investigation, other members of the Task Force and I had previously identified Penhorn Avenue in Secaucus, New Jersey as a "drop-off" location where New York-based narcotics traffickers would deliver and pick-up narcotics and narcotics proceeds. Cooperating defendants have confirmed that this location is regularly used for this purpose.

4

traffickers, MORALES' recent presence at the scene, and also the specifics of how and where the tractor trailer was being unloaded into the Impala, the Task Force member and I believed that these boxes contained contraband, likely a large quantity of narcotics.

12. The Task Force member then approached the tractor trailer and the Impala. MARIO SOSA-GINESTI, the defendant, was sitting in the driver's seat of the Impala; and a second individual later identified as ALVARO SALAZAR VELO, the defendant, was standing outside the open rear door of the trailer. The Task Force member identified himself as law enforcement and asked SOSA-GINESTI to get out of the Impala. The Task Force members asked SOSA-GINESTI what was in the trunk of the Impala (which at this point was closed) and SOSA-GINESTI stated, in substance and in part, "Anti-freeze." The Task Force member patted SOSA-GINESTI down and signalled for VELO to come over. At this time, VELO approached the Task Force member and, when asked what was in the boxes, VELO also stated, in substance and in part, "Anti-freeze." VELO appeared to be extremely nervous at this point. The Task Force member then patted down VELO. The Task Force member instructed both VELO and SOSA-GINESTI to stand near the tractor trailer and both VELO and SOSA-GINESTI seemed hesitant to comply and moved in a slow fashion. At this time, the Task Force member opened the trunk of the Impala and observed the boxes therein, one of which was partially opened. At that time, the Task Force member could not determine for sure what was in the boxes, but they did not appear to contain anti-freeze.

13. Thereafter, the Task Force member observed a man later identified as ALEJANDRO SALVADOR OROZCO, the defendant, standing inside the tractor trailer next to other boxes which appeared similar to those which the Task Force member had previously observed loaded into the Impala. The Task Force member instructed OROZCO to exit the trailer and he complied. OROZCO also appeared nervous and was repeatedly glancing at the Task Force member's holstered firearm. The Task Force member asked OROZCO to stand with SOSA-GINESTI and VELO and he, too, was slow to comply, but eventually all three defendants were standing next to the trailer.

14. At that time, the Task Force member called over ALVARO SALAZAR VELO, the defendant, and asked him again what was in the truck. VELO again said, in substance and in part, "Anti-freeze." The Task Force member told VELO that it smelled "like weed," and VELO replied, in substance and in part, that the boxes

5

did contain "weed" (referencing marijuana).[3] The Task Force member placed VELO in the rear of his vehicle, followed by ALEJANDRO SALVADOR OROZCO, the defendant, and then MARIO SOSA-GINESTI, the defendant. At this point, the Task Force member, who had been alone at the scene, contacted me and I quickly traveled to the scene.

15. When I returned to the scene, I recovered the boxes from the Impala which contained approximately 147 kilograms of cocaine wrapped in black tape or in clear cellophane, all wrapped in grease. Based on my training and experience and familiarity with the investigation, I am aware that narcotics traffickers often conceal narcotics using substances such as grease or motor oil in order to thwart efforts by law enforcement to detect the drugs.

16. After I seized the cocaine from the Impala, I radioed the other members of the Task Force who were conducting mobile surveillance of ANGEL MORALES, a/k/a "Jose Rodriguez," a/k/a "Tarenga," the defendant, in the SUV, and described the appearance of the boxes containing the cocaine. Another member of the Task Force indicated that he could see inside the SUV and observed similar boxes in the back seat and in the rear compartment from his vantage point as the windows were clear and not tinted and the Task Force member was driving in close proximity to the SUV.

17. At that point, the Task Force member conducted a traffic stop of ANGEL MORALES, a/k/a "Jose Rodriguez," a/k/a "Tarenga," the defendant, in the vicinity of the Residence. As the Task Force member approached the SUV, he observed MORALES destroy one of his cellphones by smashing into the center console of the SUV. At that time, the Task Force member, who speaks fluent Spanish, told MORALES to exit the vehicle, which he did, and then asked MORALES where he was coming from. MORALES stated, in substance and in part, "Mexico." The Task Force member then clarified and asked MORALES where he had just been coming from, and MORALES stated, in substance and in part, "Mexico." The Task Force members asked MORALES what was in the boxes in the SUV and he did not answer. The Task Force members recovered approximately 60 kilograms of cocaine from inside the boxes inside the SUV (collectively with the 147, the "Cocaine").

18. At that time, ANGEL MORALES, a/k/a "Jose Rodriguez," a/k/a "Tarenga," the defendant, consented to a search of the Residence, in which the Task Force members recovered:

---

[3] The Task Force member did not, in fact, smell marijuana at any time during the interaction.

paperwork which, based on the Task Force members training and experience, appear to be drug records; two money counting machines; and an electronic scale.

19. After seizing the Cocaine from the Impala and the SUV, it was returned to DEA headquarters and photographed:



WHEREFORE, deponent prays that ANGEL MORALES, a/k/a "Jose Rodriguez," a/k/a "Tarenga," ALEJANDRO SALVADOR OROZCO, ALVARO SALAZAR VELO, and MARIO SOSA-GINESTI, the defendants, be imprisoned or bailed as the case may be.

          JOHN BARRY
          Detective
          New York City Police Department

Sworn to before me this
30th day of August, 2007

---

HONORABLE DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

7